NOT DESIGNATED FOR PUBLICATION

No. 127,839

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

KELLOGG HOSPITALITY, LLC,
*Appellee*,

v.

JETZ SERVICE CO., INC.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; WILLIAM S. WOOLLEY, judge. Submitted without oral argument. Opinion filed June 27, 2025. Affirmed.

*Cynthia J. Sheppeard* and *Andrew D. Tague*, of Goodell, Stratton, Edmonds & Palmer, LLP, of Topeka, for appellant.

*Edward L. Robinson*, of Robinson Law Firm, LLC, of Wichita, for appellee.

Before HILL, P.J., MALONE and CLINE, JJ.

PER CURIAM: In this appeal, we must decide whether a district court correctly ruled that a commercial lease of laundry machines was unenforceable against a motel management company. The court also ruled that the owner of the machines had failed to mitigate their damages because they waited three years to assert their claims under the lease. We find both rulings to be correct.

1

*This dispute concerns some equipment at a motel near Wichita Airport.*

The management of commercial properties often involves several corporate entities. This is such a case. With the passage of time several companies had interests in this leasehold. In 1960, H.B. and Nancy Dugan leased a tract of land near Wichita Airport to Diamond Motor Inns, Inc., for 99 years. About 30 years later, Diamond leased part of the land to Airport Red Coach Inn of Wichita. That agreement did not work out, and a lender—Sunflower Bank—foreclosed on the leasehold. See *Sunflower Bank v. Airport Red Coach Inn of Wichita*, No. 95,320, 2008 WL 360641 (Kan. App. 2008) (unpublished opinion). After obtaining the leasehold at a sheriff's sale, Sunflower Bank assigned the lease to BWAC, LLC in 2008. From that point different companies became involved.

The following diagram illustrates the transition of leasehold interests to those companies.



*We now focus on the Bledsoe Management and Jetz laundry lease.*

Despite the foreclosure proceedings, business continued. In 2006, while Airport Red Coach Inn was still a tenant on the Diamond sublease—Bledsoe Management, Inc.— and Jetz Service Co. contracted for the placement of laundry machines in the motel.

The initial lease term was five years, beginning when the equipment was installed. The lease would automatically renew for successive five-year terms unless either party gave notice of termination between 90 and 120 days before the expiration of the existing term. In the lease, Bledsoe represented "that it is the owner of the property, or the authorized agent thereof, acting with full authority to enter into this agreement." Bledsoe also represented that it had "full legal authority and ability to be bound by all provisions of this agreement." The lease was recorded with the Sedgwick County Register of Deeds.

The only terms included in the recorded document were: that the lease was binding on successors, the exclusive use and possession of the leased premises, the 5-year term excluding the renewal clause, the right of first refusal, and a non-competition clause. The recorded document also provided a description of the property, stating: "Route 1 except part to City for Highway Diamond third Addition, City of Wichita, Sedgwick County, Kansas."

*BWAC assigns its subtenancy leasehold interest under the Diamond Sublease to Kellogg.*

In 2017, BWAC assigned its leasehold interest to Kellogg Hospitality, LLC, in a written Assignment of Sublease. Thereafter, Kellogg assumed the subtenancy under the Diamond Sublease. Through the exchange of BWAC's leasehold interest to Kellogg, Kellogg received a title insurance commitment, which did not mention the Jetz Lease. When it assumed the property, Kellogg discovered that the hotel was fully furnished— including two coin-operated washers and a stacked dryer in the laundry room. Each

3

machine had a sticker with the name "Jetz" and a bar code. Kellogg also noticed a sign on the laundry room wall that had "Washer and Dryer Operating Instructions," which Kellogg claims did not mention Jetz.

Seeking clarity on the laundry equipment arrangements—and because the machines were not working properly—Kellogg's owner, Jigna Patel, contacted Jetz. The email stated, "I have your equipment set up from you guys. I call[ed] your company to see what type of contract we have sign with you[] and they [gave] me your email address. I would like to get the contract from you." Jetz responded, "Please find attached to this message a New Ownership Form and W-9 for the laundry room Lease Agreement for the Best Western Red Coach Inn, located at 6815 W. Kellogg Drive, Wichita, KS 67209. Please fill in where marked, execute the W-9 Form and return to me . . . ." Kellogg did not respond to the email and a year later moved the washers and dryers into a storage room in the hotel.

Later, in 2018, a representative of Jetz visited the hotel to take photos of the washers and dryers and the signs on the wall of the laundry room. But the washers and dryers were not in the laundry room nor was Jetz' name on any sign.

Neither Jetz nor Kellogg tried to resolve their disagreement until a different Jetz representative contacted Kellogg via email in 2021 wanting to meet and discuss the use of the machines:

> "I saw where we have not had any collections at this property for several years. I looked in our database and saw that Bill Williams sent you a New Ownership Form and W9 on October 5, 2017, which was not returned. Bill is no longer with Jetz, which is why the New Ownership Form was not followed up on; however, I would like to discuss our lease agreement at this property, as well as our equipment that was installed in the laundry room that is no longer there."

Kellogg replied that Jetz' failure to respond had led to the removal of their machines:

> "Hi Steve, I took over this property in May 2017. We call[ed] your company several times to find out what was deal. The previous owner didn't le[ave] any information regarding your contract. But no one responded. We didn't receive any [communication] until 2 years . So finally we [had] to [remove] your [equipment] [a]nd set up with someone else."

At the end of 2021, Jetz sent a demand letter through its legal counsel to Kellogg and Patel individually. The letter stated that to avoid litigation, Kellogg must pay $5,447.87 in damages that Jetz claimed it incurred from 2018 to 2021. Additionally, Jetz claimed that the lease's autorenewal clause was applied in September 2021 and extended the lease five more years.

The demand letter also stated that if Jetz did not receive the $5,447.87 within 10 days, it would seek payment "of the full amount due under the Lease Agreement, and its legal expenses and attorney fees for litigation." The full amount due, Jetz claimed, included "Jetz' right to the first $1,083.57 per year generated by the laundry equipment." Therefore, in addition to the $5,447.87 for 2018-2021, Jetz sought damages from 2022 to 2026, which would equal $5,417.85. The full amount totaled $10,865.72 in damages, in addition to other expenses and attorney fees.

Kellogg did not pay any damages. But—in a final effort to resolve the dispute—Kellogg offered that Jetz repossess its laundry equipment from the hotel's storage. Jetz did not accept the offer.

*Kellogg sues, seeking declaratory judgment and damages for trespass.*

To determine Kellogg's rights and obligations under the Jetz Lease, Kellogg and Patel brought this action, requesting declaratory judgment that Kellogg was not bound by the Jetz Lease. Additionally, Kellogg requested damages for trespass by Jetz' laundry machines, seeking $100 for each month that Kellogg stored Jetz' machines. In response, Jetz brought four counterclaims: (1) breach of contract; (2) default of lease; (3) tortious interference with a contract; and (4) trespass against Kellogg and Patel individually. Jetz also asserted cross-claims against the record owners of the Property—the Nicholas Mohr Trust—for breach of contract and default of lease.

Kellogg and Patel moved to dismiss most of Jetz' counterclaims for failure to state a claim upon which relief may be granted under K.S.A. 60-212(b)(6). In response, Jetz amended its counterclaims to assert breach of real covenants; breach of contract; default of lease; and trespass, and they added breach of real covenants to its cross-claim. Then, Jetz moved for partial summary judgment, arguing that the terms of the Jetz Lease were real covenants running with the land and were thus binding on Kellogg and Patel.

*The trial court holds that Kellogg was not bound by the Jetz Lease.*

In its ruling, the trial court held that the Jetz Lease was not binding on Kellogg. The court also reasoned that "based upon all the transfers and what happened at least with Jetz with Bledsoe Management, none of those people were the parties, and, you know, for purposes of this I'm going to find that Kellogg was not a successor or assigne[e] of Bledsoe Management, Inc." But the court did not stop there.

The court reasoned that even if the Jetz Lease was binding on Kellogg—and the removal of Jetz' laundry equipment constituted a breach—Jetz failed to mitigate its damages. The court noted that Jetz' "complete silence and inaction over three years

6

demonstrates Jetz'" failure to make reasonable efforts to mitigate its damages. "Jetz did nothing, literally nothing, until mid 2021 to attempt to get the machines back in revenue producing operations."

On Kellogg's claim for damages, the trial court held Kellogg failed to prove its claim for damages incurred while storing Jetz' equipment and—had Kellogg proven its damages—Kellogg failed to mitigate its damages and was thus barred from recovery. In sum, the trial court denied damages to both parties.

In this appeal we address two questions. Was the lease binding on Kellogg as the third subtenant on the Diamond Sublease? Did Jetz fail to mitigate its damages by waiting three years to assert its claims under its lease?

*Whether this lease is binding is a question of fact and law.*

Courts have addressed the questions of contract applicability many times. Here we must consider five aspects of the circumstances. For the burden of a covenant running with the land to be binding on successors in interest, there are several elements that must all be met, which include (1) notice—actual or constructive; (2) intent; (3) the covenant touches and concerns the land; (4) it must be in writing; and (5) there must be privity of estate between the original parties, the original parties and the present disputants, or between the claimed benefitting party and the burdened party. *Schlup v. Bourdon*, 33 Kan. App. 2d 564, 569, 105 P.3d 720 (2005).

There are also some fundamental considerations that we have to assess. To establish privity of estate sufficient to bind the burden of a covenant, the original grantor must "possess such an interest in the property as to amount to a privity of estate between the parties to the covenant." 20 Am. Jur. 2d, Covenants § 27. Privity of estate "describes the legal relationship created between the parties to the subject property." 20 Am. Jur. 2d,

Covenants § 27 (citing *Federated Retail Holdings, Inc. v. County of Ramsey*, 820 N.W.2d 553, 560 [Minn. 2012]); see also *Goering v. Huestis*, No. 124,293, 2022 WL 1276856, at *2-3 (Kan. App. 2022) (unpublished opinion) (applying 20 Am. Jur. 2d, Covenants). We will follow these precepts here.

*The trial court's factual findings were reasonable.*

Jetz argues that the trial court erred by holding that the Jetz Lease did not bind Kellogg because in Jetz' view, the lease was a covenant running with the land.

The trial court was in the best position to weigh the evidence, assess witnesses' credibility, and resolve any conflicts. In its ruling, the court detailed all the parties and their interests:

> "The owners at one point were the Dugans. The sublessee was Diamond Inn Investments, it was the original sublessee of the hotel building. In 1994 Diamond Inn subleased the building to Airport Red Coach Inn. Harry Bledsoe was the president of Diamond, and to date Diamond is still the—what I would call the sublandlord."

Thus, at this point, the Dugans owned the property and leased it to Diamond who subleased the hotel building to Airport. But the dispute between Sunflower Bank and Airport led to the foreclosure of Airport's leasehold interest:

> "At some point there was a loan of the leasehold at Sunflower Bank who sued and foreclosed on the breach of whatever agreement there was and the sublease was mortgaged. There was also at some point, according to the testimony, dispute between the Pyles family and Bledsoe, and Bledsoe ended up holding the leasehold through a company called BWAC, LLC."

Therefore, the dispute led to BWAC assuming the subtenancy, which the court noted BWAC did not sign an agreement with Jetz:

> "BWAC is not the same as Bledsoe Management, Inc.; although Harry Bledsoe is running through all this somehow. Bledsoe Management, Inc. was managing the property. On December 10th of 2006, Bledsoe Management, Inc., not the titled owners, not Diamond, Inc., the sublandlord lessee or sublandlord, not BWAC, the lessee, signed a lease with Jetz."

The court also noted the evidence showed that "[a]t some point in time, Bledsoe Management, Inc. was doing business as Best Western Airport, and the Best Western operation was the latest of the motel operations and building." But after reviewing the list of all the record owners, lessees, sublandlords, and subtenants, the court held that Bledsoe Management was not on the list:

> "Because of the Sunflower foreclosure on the building, sublease interest in August of 2008, Sunflower conveyed its sublease hold to BWAC and Diamond confirmed BWAC was the sublessee. Diamond is and I believe remains still be the sublandlord, and those are Exhibits 6 and 7. The BWAC signed the memorandum of sublease, *not Bledsoe Management*, and the Jetz lease is not listed as an assigned agreement. Jetz continued to operate under the washer-dryer lease with—as stated with Bledsoe Management, at a minimum up until 2017. On May of—May 17, 2017, BWAC had signed its interest in the sublease of the building as sublessee to Kellogg Hospitality, Inc., *the assignment was not by Bledsoe Management*, but was by BWAC, by West Wichita, Inc., West LLC Management . . . ." (Emphases added.)

The court then found that the Jetz Lease was binding on Bledsoe and Jetz' lessors, successors, and assigns. But that issue became problematic because simply Bledsoe Management had no real interest in the leasehold:

"[W]ith the number of entities between the ownership, Bledsoe Management, Inc. . . . Bledsoe Management, Inc. signed the lease, not the titled owner of the real estate, not the owner of the—not the title owner of the real estate, not the sublandlord which is Diamond, and not the sublessee of Diamond at the time it was signed by Bledsoe Management, Inc., and BWAC never signed the—never signed the lease, no one signed it saying that BWAC was a party to the lease and that Bledsoe Management, Inc. was their agent with authority to sign."

Finally, the trial court concluded that, "based upon all the transfers and what happened at least with Jetz with Bledsoe Management, none of those people were the parties, and, you know, for purposes of this I'm going to find that Kellogg was not a successor or assigned of Bledsoe Management, Inc."

*The trial court's factual findings are supported by substantial competent evidence.*

Our review of the record reveals no evidence showing any relationship between Bledsoe Management and any owner, lessor, lessee, sublandlord, or subtenant in this case. Though Harry Bledsoe was president of Diamond—as reflected in the signature on the Airport Sublease—no evidence shows Bledsoe Management had authority to enter into a lease agreement with Jetz. Without privity of estate between Bledsoe Management and any leaseholder in this case, the Jetz Lease cannot be construed as a real covenant running with the land. Kellogg is therefore not bound by the Jetz Lease. We hold that this laundry equipment lease is unenforceable and affirm the district court's judgment on this point.

*Waiting three years to do something is never helpful.*

The trial court held that even if Jetz could recover its requested damages, Jetz failed to engage in reasonable efforts to mitigate its damages. In its ruling, the court noted the duties required by an injured party to exert reasonable efforts to minimize its loss and

10

concluded that "Jetz did nothing, literally nothing, until mid 2021 to attempt to get the machines back in revenue producing operations." Because Jetz failed to mitigate its damages, the trial court held that even if Kellogg was bound by the Jetz Lease and breached the agreement by removing Jetz' laundry equipment, Jetz could not recover any damages.

We must agree with the district court. Mitigation of damages is an affirmative defense, requiring the party asserting the defense to prove a failure to exercise reasonable efforts to mitigate damages. *Leavenworth Plaza Assocs., L.P. v. L.A.G. Enterprises*, 28 Kan. App. 2d 269, 271-72, 16 P.3d 314 (2000).

Jetz asserts that it should not be required to prove actual damages for its trespass claim. Generally, Jetz is correct that if actual damages are not proven, an injured party may recover nominal damages on a trespass claim. But by waiting three years, and conveniently allowing the lease to automatically renew, Jetz failed to take reasonable steps to mitigate its damages. Therefore, even if Jetz could recover nominal damages, Jetz would still be barred from recovery for failing to mitigate its damages. Accordingly, the trial court did not err in barring recovery of Jetz' damages.

We affirm the district court's ruling on mitigation of damages.

Affirmed.

11